IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| J.U., I.Y. and S.T., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SALT LAKE COUNTY, et al.,<br><br>Defendants. | **MEMORANDUM DECISION**<br><br>Case No. 2:82-CV-01043-BSJ<br><br>District Judge Bruce S. Jenkins |

This matter comes before the court on Defendants' Motion to Terminate Consent Decree (ECF No. 110) and Renewed Motion to Terminate Consent Decree (ECF No. 363) (collectively "Motion to Terminate"). The Motion to Terminate asks the court, pursuant to 18 U.S.C. § 3626(b) of the Prison Litigation Reform Act ("PLRA"),[1] to terminate the prospective relief set forth in a Consent Decree, which was stipulated by the parties (or their predecessors) and entered by the court in this case on November 29, 1984.

The court heard argument on the Motion to Terminate during various pretrial conferences during fall 2017.[2] The court heard further argument on the Motion to Terminate during a motion hearing in August 2018.[3] During these hearings, Kathryn Collard argued on Plaintiffs' behalf,

---

[1] While Defendants' Motion to Terminate cites Rule 60(b)(5) (ECF No. 110 at 2; ECF No. 363 at 1), Defendants later clarified they invoke Rule 60 only as an "alternative basis for relief" from the PLRA. Defs.' Resp. re: Suppl. Authority, 5 (ECF No. 490).

[2] Pretrial Tr. (ECF Nos. 443, 445, 480).

[3] Min. Entries (ECF Nos. 501–02).

and Darcy M. Goddard of the Salt Lake County District Attorney's Office argued on Defendants' behalf.[4] After hearing the parties' respective arguments, the court took the matter under advisement. The court has carefully considered the parties' arguments and the law and facts relevant to the Motion to Terminate and now, being fully advised, will grant Defendants' Motion to Terminate the 1984 Stipulated Consent Decree.

I. **BACKGROUND**

On October 27, 1982, Donald Leonard, and others, on behalf of themselves and all others similarly situated, filed the Complaint in this case.[5] Plaintiffs, mentally-ill inmates then confined or who may later be confined in the Salt Lake County Jail ("Jail"), complained of an absence of mental-health screening and treatment at the Jail.[6] Plaintiffs alleged this absence violated their right to Due Process under the Fourteenth Amendment and their right under the Eighth Amendment to be free from cruel and unusual punishment.[7]

After approximately two years of litigation, counsel for the parties, including then-Salt Lake County Sheriff Norman D. "Pete" Hayward, stipulated to the entry of the Consent Decree, which the court signed on November 29, 1984.[8] The Consent Decree required Sheriff Hayward, along with other Salt Lake County officials, to construct and operate a mental-health facility for inmates. The Consent Decree also required the County to screen detainees for mental illness,

---

[4] Plaintiffs were also represented at various stages by Aaron Kinikini, and his associates from the Disability Law Center, who filed a Notice of Appearance on March 2, 2016. (ECF No. 184).

[5] Am. Compl. (ECF No. 1; ECF No. 148, Ex. 6).

[6] *Id.*

[7] *Id.* at 2.

[8] Consent Decree (ECF No. 110, Ex. A).

2

and otherwise governed the County's conduct toward mentally-ill inmates held in the Salt Lake County Jail.[9]

On April 29, 2015, Defendants filed a Motion to Terminate Consent Decree seeking to terminate the 1984 Consent Decree in this case, to the extent it continues to affect the new Salt Lake County Jail.[10] Congress enacted PLRA on April 26, 1996. Defendants contend the Consent Decree is subject to termination because the order was entered long prior to PLRA's enactment and more than two years have passed since PLRA's enactment. Defendants contend termination is warranted here because the Consent Decree does not contain the findings required by PLRA that the relief granted by the decree be necessary, "narrowly drawn and the least intrusive means to correct the violation." 18 U.S.C. § 3626(b)(3).

In late 2015, the court granted Plaintiffs' request for limited discovery of current Jail policy manuals, a visit to the current Jail, and interviews of Jail staff.[11] After a request from Defendants, the court entered a scheduling order in early 2016.[12] The court initially set a September 16, 2016 discovery deadline but eventually extended this date to March 3, 2017.[13] The parties conducted extensive discovery. Defendants written discovery production spans over 100,000 pages.[14]

---

[9] *Id.*

[10] Mot. Terminate Consent Decree (ECF No. 110). The physical facility extant at the time of the 1984 Consent Decree has since been torn down and rebuilt. *See infra* Part II.b.1.

[11] Min. Entries (ECF Nos. 124, 138, 150).

[12] First Mot. Scheduling Order (ECF Nos. 180); Min. Entry (ECF No. 181).

[13] Min. Entry (ECF Nos. 181); Second Am. Sched. Order (ECF No. 231).

[14] Decl. Darcy M. Goddard Supp. Salt Lake Cnty.'s Renewed Mot.

On April 27, 2017, Defendants filed a Renewed Motion to Terminate the 1984 Consent Decree.[15] That renewed motion focused on Defendants' asserted compliance with applicable constitutional standards when processing and treating mentally-ill inmates. Defendants also assert that, even assuming the court finds a current constitutional violation, the 1984 Consent Decree does not satisfy the "need-narrowness-intrusiveness" requirement of the PLRA. In their opposition, Plaintiffs argue Defendants have been deliberately indifferent to inmates' serious medical needs. Plaintiffs list ten areas in which Plaintiffs believe Defendants have failed to meet the needs of mentally-ill inmates.[16]

The court heard oral argument on the Motion to Terminate during a pretrial conference beginning on September 6, 2017, reconvened the following day, and reconvened again on October 25, 2017.[17] The court heard further argument on the Motion to Terminate during a motion hearing convened on August 7, 2018, and reconvened on August 15, 2018.[18] At the conclusion of the August 15 hearing, the court asked Defendants to submit a written analysis of the County's substantial compliance with the Consent Decree and offered Plaintiffs an opportunity to respond.[19]

---

[15] Renewed Mot. Terminate Consent Decree (ECF No. 363).
[16] Mem. Opp'n Renewed Mot. Terminate Consent Decree (ECF No. 399).
[17] Pretrial Tr. (ECF Nos. 443, 445, 480).
[18] Min. Entries (ECF Nos. 501–02).
[19] Mot. Hr'g Tr., Aug. 15, 2018, 55:1–19, 75:11–76:24 (ECF No. 503).

## II. ANALYSIS

### a. The Consent Decree is terminable

The Consent Decree is terminable because it was entered in November 1984, over eleven years before the PLRA's enactment on April 26, 1996. The PLRA provides that prospective relief relating to prison conditions "shall be terminable upon the motion of any party or intervener . . . in the case of an order issued on or before the date of enactment of the Prison Litigation Reform Act, 2 years after such date of enactment." 18 U.S.C. § 3626(b)(1)(iii). Plaintiffs agree that the Consent Decree predates PLRA and that two years have elapsed since PLRA's enactment.[20] Accordingly, the Consent Decree is terminable. The court will now examine whether termination is warranted.

### b. The court finds termination of the Consent Decree appropriate here

The court finds termination appropriate under the terms of the PLRA. As an initial matter, the Consent Decree lacks the requisite findings. The PLRA states Defendants "shall be entitled to the immediate termination of any prospective relief if the relief was approved or granted in the absence of a finding by the court that the relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(b)(2). Once again, Plaintiffs correctly concede that the Consent Decree, which predates PLRA, does not contain the requisite narrowness-necessary-intrusiveness findings.[21] Accordingly, Defendants meet the initial threshold for termination under the PLRA.

---

[20] Mem. Opp'n Renewed Mot. Terminate Consent Decree, 99 (ECF No. 399).
[21] *Id.*

5

Nonetheless the PLRA limits termination and the parties vigorously disagree about whether that limitation should preclude termination here. The PLRA states:

> Prospective relief shall not terminate if the court makes written findings based on the record that prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation.

18 U.S.C. § 3626(b)(3). For the reasons set forth below, termination is appropriate here.

### 1. Termination is appropriate because circumstances have changed since entry of the Consent Decree

Put plainly, history has moved on and the Consent Decree is simply out of date. The old Salt Lake County Jail was abandoned. The new Salt Lake County Jail was built. It is located at 3415 South 900 West in Salt Lake City, Utah.[22] The physical facilities and Defendants' treatment of the mentally ill has evolved. The old Jail facility at issue in the Consent Decree was constructed in 1966 at 450 South 300 East in Salt Lake City, Utah,[23] to replace a far more ancient structure on Second East.[24] The Third East Jail ceased to exist in approximately the year 2000.[25] The Consent Decree sought to correct conditions in a markedly different facility than exists currently and it imposed requirements on specific units of the Third East facility that simply no

---

[22] Salt Lake Cnty.'s Suppl. Mot. Terminate, 6 (ECF No. 148). The court notes this motion was subsequently withdrawn. *See* Defs.' Notice of Withdrawal (ECF No. 179). Nonetheless, Plaintiffs do not dispute the history of the old Jail building, only the effect of that history. *See* Pls.' Mem. Opp'n Salt Lake Cnty.'s Suppl. Mot. Terminate 2, 5–6 (ECF No. 161).

[23] Salt Lake Cnty.'s Suppl. Mot. Terminate, 6 (ECF No. 148).

[24] History of Salt Lake County, Salt Lake County Auditor's Office, *available at* https://slco.org/uploadedFiles/depot/admin/fArchives/government_history/SLCoHistory.pdf.

[25] Salt Lake Cnty.'s Suppl. Mot. Terminate, 6 (ECF No. 148); Renewed Mot. Terminate Consent Decree, 9 (ECF No. 363).

longer exist.[26] The Consent Decree required construction and operations of "a fifty (50) bed . . . mental health facility for the confinement and treatment of mentally ill persons" at the Third East Jail.[27] While this construction was accomplished, the facility was torn down with the rest of the Jail in approximately 2000. The new Jail included 17-bed Acute Mental Health Unit and a 48-bed unit for the sub-acute mentally ill, which Defendants have operated continuously since the new Jail opened.[28]

In addition to physical changes, there has been a shift in attitude toward mental illness since the Consent Decree was entered. The Complaint filed in 1982 alleged nightmarish scenarios in which Defendants largely ignored mentally-ill inmates who hid under their beds from hallucinated voices, were starved by fellow inmates, and held naked in isolation cells.[29] Despite the obvious suffering, Defendants' predecessors allegedly responded by isolating inmates, rather than making any inquiry about their mental health or providing treatment.[30] It is against this backdrop the parties settled their differences and the court entered the Consent Decree. There is no evidence in this record to suggest Defendants currently exhibit this type of indifference to inmates' mental health, as discussed below.[31]

---

[26] *E.g.* Consent Decree at 8, 10–11 (ECF No. 110, Ex. A) (imposing bed-number limits on Units 2B, 2F, and 2G and restricting use of "5 Cells," the "Administrative Segregation Unit," and "Behavior Modification Unit" of the former Salt Lake County Jail).

[27] *Id.* at 5.

[28] Renewed Mot. Terminate Consent Decree, 19–21 (ECF No. 363); *See* Mem. Opp'n Renewed Mot. Terminate Consent Decree, 22 n.6 (ECF No. 399).

[29] Am. Compl. 3–8 (ECF No. 1).

[30] *Id. passim.*

[31] *Infra* Part II.b.2.

Accordingly, the court will vacate the Consent Decree. The court does so, in part, because the facility at issue in the Consent Decree no longer exists. Aside from noncompliance with PLRA, the court declines to test current conduct at the new Salt Lake County Jail against the Consent Decree issued in 1984. In sum, the Consent Decree is not necessary to correct any current or ongoing comparable violation at the new Salt Lake County Jail.

### 2. Termination is also appropriate because Plaintiffs have not sufficiently identified any current and ongoing constitutional violation

The more interesting question is whether Plaintiffs have sufficiently identified any current and ongoing constitutional violation at the new facility. The court finds they have not. As noted above, the court may only continue prospective relief in the Consent Decree if the court finds "a current and ongoing violation of the Federal right . . . ." 18 U.S.C. § 3626(b)(3). Plaintiffs claim Defendants violated their rights under the Eighth and Fourteenth Amendments by demonstrating deliberate indifference to Plaintiffs' serious medical needs and inflicting punishment on pretrial detainees.[32] As the Supreme Court held, "a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). Nonetheless, "a mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives does not support a claim of cruel and unusual punishment." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). Also, as to pretrial detainees, the Due Process Clause of the Fourteenth Amendment prohibits punishment prior to adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). The line between punishment

---

[32] Mem. Opp'n Renewed Mot. Terminate Consent Decree, 100–03 (ECF No. 399).

and appropriate conditions of confinement is measured by whether restraints on inmates' liberty are reasonably related to legitimate governmental interests, including jail security. *Id.* at 540. Here, the court declines in this case to find any current and ongoing deliberate indifference or punishment of pretrial detainees because Plaintiffs have not presented or proposed sufficient evidence or even a satisfactory discrete description of any violation as to Plaintiffs.

Plaintiffs argument consists almost entirely of conclusions that a list of ten "systemic deficiencies" amount to Defendants' deliberate indifference to mentally-ill inmates' serious medical needs. The alleged deficiencies include:

> 1. Failing to segregate mentally ill inmates from the general population;
> 2. Failing to provide adequate mental health admission screening;
> 3. Failing to provide adequate mental health facilities[33];
> 4. Failing to provide sufficient and qualified mental health staff with clear lines of authority;
> 5. Confining seriously mentally ill inmates ["SMI"] under harsh and anti-therapeutic conditions and restrictions without individualized determination of those restrictions and without individualized and adequate treatment;
> 6. Failing to transfer seriously mentally ill to other facilities when Jail cannot provide necessary care and treatment;
> 7. Lack of appropriate treatment for SMI inmates determined incompetent to stand trial and awaiting competency treatment at Utah State Hospital;
> 8. Improper use of Administrative Segregation;
> 9. Inadequate and Dangerous Suicide Prevention Program; and
> 10. Chronic Overcrowding (Exacerbating Constitutional Violations).[34]

While the court believes Plaintiffs are well intended, their arguments suffer from a lack of specific focus. The court notes at the outset that Defendants discussed the Jail's policies and procedures used to identify and treat mentally-ill inmates.[35] To the extent Plaintiffs assert

---

[33] While Plaintiffs label this as an attack on Jail facilities, the law and facts they cite relate to provision of exercise time rather than physical facilities.

[34] Mem. Opp'n Renewed Mot. Terminate Consent Decree, 105–06 (ECF No. 399).

[35] *E.g.* Salt Lake County's Reply Mem. Support Motion to Terminate 6–16 (ECF No. 413).

9

Defendants *lack* any policies related to the ten asserted deficiencies, that assertion is belied by the record. Next, in setting forth their list of grievances, Plaintiffs' make no attempt to differentiate between constitutional mandates and their personal, or expert's, preferred method for running the Jail. Moreover, Plaintiffs simply fail to point to evidence sufficient to justify an evidentiary hearing in this matter. Plaintiffs do not identify any violation of a single inmate's rights, much less a systemic violation depriving inmates of access to mental-health care or inflicting punishment on pretrial detainees. Indeed, Plaintiffs do not make any clear argument supporting their conclusion that the asserted deficiencies cause, or amount to, constitutional violations. Instead, Plaintiffs' brief contains various legal citations, references to the Consent Decree, combined with various citations to expert reports, news reports, and assorted other materials without any attempt to tie these materials together.[36] Given Plaintiffs' failure to adequately brief any constitutional violation and the lack of evidence of deprivation, the court declines, on the current record, to find any current and ongoing violation of Plaintiffs' constitutional rights.

### A. *Plaintiffs do not outline any alleged constitutional violation*

Plaintiffs cite various nonbinding materials without explaining how these materials might be relevant to the court's analysis.[37] Plaintiffs point to several provisions in the Consent Decree to support their argument. Yet Plaintiffs acknowledge that the Consent Decree does not set the constitutional standard.[38] Also, Plaintiffs cite to various professional standards, including those

---

[36] *Id.* at 21–98.

[37] *E.g.* Mem. Opp'n Renewed Mot. Terminate Consent Decree, 21–22 (ECF No. 399) (citing Consent Decree requirement that mentally-ill inmates be segregated from general population).

[38] *Id.* at 100.

10

of the National Commission on Correctional Healthcare ("NCCHC"), the American Psychiatric Association, and the U.S. Department of Justice.[39] These organizational standards cannot substitute for constitutional standards and Plaintiffs do not explain their constitutional significance. Next, Plaintiffs advance other standards supported by only their expert's say-so. For example, Plaintiffs' expert acknowledged that advanced practice registered nurses in Utah may practice without physician supervision, but he opines they should be supervised by a psychiatrist when working at the Jail (there is now an onsite psychiatrist).[40] Plaintiffs offer no legal footing for this opinion. Indeed, they appear to concede the opinion runs contrary to law. Though these materials may be relevant in an abstract way, Plaintiffs have not shown that failure to follow an NCCHC standard,[41] or any of the other standards cited, equates to a constitutional violation. The court will not sort out disagreements between Defendants and Plaintiffs about how to best run a jail. Accordingly, the material is simply not sufficient to define the applicable constitutional standard and show it is not followed.

Finally, Plaintiffs cite persuasive authority, but make no effort to link the authority cited to Defendants' conduct. For example, Plaintiffs cite to various out-of-circuit cases. While persuasive authorities are often helpful to the court, many of the cited cases resemble this case when filed in 1982, but not the modern Salt Lake County Jail. *E.g. Finney v. Mabry*, 534 F. Supp. 1026, 1036–37 (E.D. Ark. 1982) (discussing constitutional violations at the Arkansas Department of corrections which "had no mental health personnel"). Rather than offer some

---

[39] *Id.* at 40, 55.

[40] *Id.* at 59–60.

[41] The court notes the experts differ about whether the Jail violates NCCHC standards in the first instance. *E.g.* Decl. Pamela Lofgreen, 18 (ECF No. 369).

connection between the cited cases and this one, Plaintiffs simply conclude there is a constitutional violation somewhere in the facts they cite. Thus, armed with little more than the broad constitutional rules prohibiting punishment of pretrial detainees and deliberate indifference to inmates' serious medical needs, the court turns to the Plaintiffs' proffered facts.

### B. *Plaintiffs do not identify facts that amount to a constitutional violation*

Plaintiffs' extensive recitation of "facts" spans about seventy pages. Despite the bulk of material presented, Plaintiffs do not offer evidence of a constitutional violation. Again, the court recognizes the sincerity of effort on the part of counsel, but notwithstanding that earnestness, the court cannot overlook the absence of evidence. Plaintiffs do not point to evidence that Defendants acted with deliberate indifference to Plaintiffs' serious medical needs or imposed punishment on pretrial detainees. As discussed in detail below, Plaintiffs' proffered evidence is dated, if not stale, and does not identify any actual or anticipated harm to any specific inmate.

> i. PLAINTIFFS EVIDENCE IS DATED AND FAILS TO IDENTIFY ANY INMATES IMPACTED BY ANY PURPORTED DEFICIENCY

Plaintiffs cite dated evidence that is insufficient to show any current and ongoing constitutional violation. The PLRA requires consideration of "current and ongoing" violations. 18 U.S.C. § 3626(b)(3). This phrase requires the court to consider conduct that is both recent and bears some reasonable risk of continuation or repetition. Plaintiffs' evidence is lacking in this regard. Plaintiffs largely, but not exclusively, focus on the 2015 timeframe when Defendants first filed their Motion to Terminate Consent Decree. For example, they cite a 2015 Report to the Utah Judicial Council on Pretrial Release and Supervision Practices, and a 2015

Report from the Council of State Governments Justice Center.[42] Plaintiffs also offer a great deal of evidence from an earlier time period. For example, much of Plaintiffs' proffered evidence comes from their expert, Dr. Moulton, who discusses his observations of Defendants' conduct when he worked at the Jail from 2013 until 2016.[43] The Dr. Moulton timing problem is compounded because Plaintiffs make little attempt to identify when, during this three-year period, Dr. Moulton made any particular observation. Plaintiffs also cite a December 2001 Salt Lake County Jail Performance Audit that is even more outdated.[44] This dated evidence does not avail Plaintiffs here because it does not speak to current and ongoing violations.

Additionally, with a single exception,[45] Plaintiffs fail to identify any particular inmate subject to any of the allegedly-wrongful conduct described in Plaintiffs' brief. Plaintiffs admitted multiple times that they could not identify any inmate subjected to the practices about which they complain.[46] This creates a serious evidentiary absence because Plaintiffs' alleged deficiencies–except, perhaps, deficiency four[47]–invite the court to examine how Defendants'

---

[42] *See* Mem. Opp'n Renewed Mot. Terminate Consent Decree, 22, 34 (ECF No. 399)

[43] Confidential Report Pls.' Expert David L. Moulton, M.D. (ECF No. 293).

[44] ECF No. 400, Ex. 5.

[45] Plaintiffs identify one inmate by the initials M.A., but fail to identify any violation of that inmate's constitutional rights. *See* Mem. Opp'n Renewed Mot. Terminate Consent Decree, 33, 73–74 (ECF No. 399). Also, several of the M.A. allegations relate to issues with the Utah State Hospital, rather than the Jail, and those claims relate to a lawsuit settled before another judge in the District of Utah. *Disability Law Center v. State of Utah*, Case No. 2:15-cv-00645-RJS (D. Utah). Finally, even assuming M.A.'s rights were violated, the Consent Decree cannot reasonably be considered narrowly drawn or the least-intrusive means to correct issues that impact only a single inmate.

[46] *See* Pretrial Tr., Oct. 25, 2017, 91 (ECF No. 480); Mot. Hr'g Tr., Aug. 15, 2018, 74:16–22 (ECF No. 503).

[47] Addressed separately below. *Infra* Part II.b.2.B.ii. While Plaintiffs' overcrowding suggestion may also be capable of determination without reference to particular inmates, Plaintiffs make no

13

handle mentally-ill inmates. To summarize Plaintiffs alleged deficiencies, they contend the Jail fails to identify mentally-ill inmates through proper screening and fails to adequately treat the inmates it does identify. Yet Plaintiffs offer no example of an inmate who was improperly screened or treated. Contrarily, Defendants presented the court with ample evidence that the Jail has policies in place to identify and treat mentally-ill inmates and that Defendants generally carry out those policies.[48] Accordingly, on the record before it, the court declines to find any current and ongoing constitutional violation stemming from Defendants' treatment of mentally-ill inmates. The factual record is simply insufficient for Plaintiffs to advance in this case.

Plaintiffs attempt to excuse their lack of evidence by claiming they intend to establish systematic rather than individual violations. Plaintiffs quote *Ramos*, suggesting "there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980). Plaintiffs then point out that Eighth Amendment claims may be brought for harm already suffered as well as "sufficiently imminent dangers." *Helling v. McKinney*, 509 U.S. 25, 34 (1993). While the court agrees with the cited legal principles, they are ultimately academic. Plaintiffs chose to assert deficiencies primarily with the Jail's treatment of inmates. For example, Plaintiffs allege "harsh and anti-therapeutic conditions and restrictions without individualized determination of those restrictions and without individualized and

---

suggestion of overcrowding in the constitutional sense. Rather, they point to Defendants' difficult choice to release inmates, who otherwise might be held, to avoid overcrowding in the constitutional sense. *E.g.* Decl. Pamela Lofgreen, 3–4 (ECF No. 369).

[48] *E.g.* Salt Lake County's Reply Mem. Support Motion to Terminate 6–16 (ECF No. 413).

adequate treatment."[49]  Yet the facts Plaintiffs cite to support this assertion contain no description of how Defendants treated any inmate.  Also, Plaintiffs offer little description of *when* any purported violation occurred.  Plaintiffs vaguely allege that some unidentified inmates were deprived of personal items, bedding, and deprived of time out of their cell.[50]  Yet Plaintiffs offer no example of any such treatment.  Given the absence of evidence, the court cannot determine whether the Jail deprived anyone–let alone everyone–of mental-health screening or treatment.  There are legitimate reasons, particularly jail security and the potential for suicide, that may justify Defendants' alleged actions.  Those decisions are made jointly between Jail and medical staff.[51]  Without some specific example of the conduct about which Plaintiffs complain, Defendants, and ultimately the court, are unable to meaningfully weigh the merits of Plaintiffs' arguments.

Notwithstanding Plaintiffs' general failure to offer current and timely evidence, and their failure to identify inmates subjected to purportedly-deficient treatment, Plaintiffs' fourth asserted deficiency, regarding mental-health staffing, offers some evidence of institutional conduct during the relevant time.  Accordingly, the court turns now to jail staffing.

      ii.      PLAINTIFFS SHOW NO DEFICIENCY IN JAIL STAFFING

The Constitution requires Defendants to provide adequate levels of mental-health staff, though the precedent offers little in the way of a bright-line test.  *See Ramos*, 639 F.2d at 578.  The *Ramos* court affirmed a district court's finding that a prison, euphemistically called "Old Max," violated inmates' rights, in part, because it did not employ any on-site psychiatrist or

---

[49] *See* Mem. Opp'n Renewed Mot. Terminate Consent Decree, 60–66, 105 (ECF No. 399).
[50] *Id.* at 62–63.
[51] Renewed Motion to Terminate Consent Decree, 39–43 (ECF No. 363)

15

psychologist. *Id.* Instead, Old Max only employed a psychiatrist from another facility who visited once every other month along with full-time staff consisting of three civilians and two inmates who spent all their time doing clerical work. *Id.* "Experts uniformly agreed that for Old Max to have a minimally adequate mental health program it needed at least one full time psychiatrist." *Id.*

As evident from lengthy discussion of mental-health-staffing levels at the Jail, circumstances in this case differ greatly from *Ramos*. First, unlike *Ramos*, the experts here disagree about the necessary level of psychiatric staffing.[52] Next, Plaintiff has not shown that current staffing levels deprive Jail inmates of treatment for their serious medical needs. Plaintiffs acknowledge that, when their expert visited in 2016, the Jail employed two full-time-equivalent psychiatric providers in the form of part-time psychiatrists and advanced practice registered nurses.[53] Also, during the pendency of Defendants' motion, the Salt Lake County Jail hired Psychiatrist Michael Smith.[54] This adds to several caseworkers and other mental health professionals identified in Defendants' organizational chart.[55] Plaintiffs offer no legal authority to demonstrate this staffing falls below any constitutional minimum, including *Ramos*.

Also, setting aside *Ramos* or any other authority, the count finds Plaintiffs fail to show deliberate indifference or punishment of pretrial detainees. Indeed, some allegations are facially deficient. For example, Dr. Dvoskin suggests mentally-ill inmates face delays in receiving

---

[52] *See generally* Joel Silberberg, M.D. Expert Report in Rebuttal (Ex. 363, Ex. I)

[53] *See* Mem. Opp'n Renewed Mot. Terminate Consent Decree, 43 (ECF No. 399).

[54] Fourth Decl. Darcy M. Goddard, 2 (ECF No. 494); Mot. Hr'g Tr., Aug. 15, 2018, 4:1–5:16 (ECF No. 503).

[55] Fourth Decl. Darcy M. Goddard, Ex. A (ECF No. 494).

16

treatment, but he discusses a mental health response within "5-10 minutes" during the day.[56] Without some authority to the contrary, the court finds a ten-minute wait does not amount to deliberate indifference under the circumstances Plaintiffs describe. Dr. Dvoskin also mentions a 10- to 14-day delay to see a psychiatrist. Such a delay is potentially more serious. Yet, as with nearly all of Plaintiffs' assertions, there is no factual detail such as identification of the complaining inmate or the required treatment denied. Further, Plaintiffs offer no factual detail about whether this is a customary delay corroborated by other evidence, or merely the claim of a single inmate without support or verification. Dr. Dvoskin makes many assertions that fall in the latter category.[57] Plaintiffs' remaining factual assertions fare no better because they tend to raise questions rather than answer them. In some instances, Plaintiffs literally pose questions.[58] Additionally, Dr. Moulton sets forth several facts that are no longer accurate given staffing increases and he recites disagreements with Jail administration that do not amount to violations.[59] In short, Plaintiffs offer no evidence that the current staffing deprives inmates of mental-health treatment or amounts to punishment of pretrial detainees.

Based on the foregoing, the court declines to find any current and ongoing constitutional violation. Plaintiffs offer many conclusions that Defendants violated their rights and offer evidence of several practices with which they disagree. Notwithstanding Plaintiffs' laudable efforts, they have not proffered evidence of a current and ongoing constitutional violation.

---

[56] Mem. Opp'n Renewed Mot. Terminate Consent Decree, 45 (ECF No. 399).

[57] Dvoskin Expert Report, 9–10 (ECF No. 292, Ex. 1).

[58] *E.g.* Mem. Opp'n Renewed Mot. Terminate Consent Decree, 45 ("How much time are [mental-health professionals present] on these units? What do they do when they are there?").

[59] *E.g. Id.* at 58–60.

Finally, the court's refusal to find a constitutional violation must be read in the context of this case. The court, on the record before it, only declines to find a current and ongoing violation of Plaintiffs' constitutional rights and concludes that any alleged constitutional violations can be best addressed outside this Consent Decree class-action case.

### III. ORDER

Based on the foregoing, Defendants' Motion to Terminate is hereby GRANTED. (ECF Nos. 110, 363). The court FINDS MOOT the remaining motions pending in this case.

Dated this 13th day of March 2019.

BY THE COURT

Bruce S. Jenkins
United States Senior District Judge